IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JERRY A. NANCE,

      Plaintiff,

v.                                  No. 14-1264

CROCKETT COUNTY, TENNESSEE,

      Defendant.

---

ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

*INTRODUCTION*

On October 7, 2014, the Plaintiff, Jerry A. Nance, brought this action against the Defendant, Crockett County, Tennessee (the "County"), alleging violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* (the "FLSA"). (Docket Entry "D.E." 1.) Before the Court are the parties' cross-motions for partial summary judgment. (D.E. 23, 25.)

*STANDARD OF REVIEW*

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in the nonmoving party's favor. *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015). "There is a genuine issue of material fact only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). "The test is

whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citing *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted). The moving party must initially show the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). It is then incumbent upon the nonmoving party to "present significant probative evidence to do more than show that there is some metaphysical doubt as to the material facts to defeat the motion." *Id.* (internal quotation marks omitted). The court may not make credibility determinations or weigh evidence as these are functions of the jury rather than the judge. *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015). Cross-motions for summary judgment are analyzed under the same standard, with each motion being evaluated on its own merits.. *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 335 (6th Cir. 2010). A party may move for partial summary judgment identifying a claim or part of a claim on which summary judgment is sought. *Crook v. Rabbit River Enter., Inc.*, No. 1:14-cv-118, 2015 WL 3626695, at *1 (W.D. Mich. June 10, 2015); Fed. R. Civ. P. 56(a).

"[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) (internal quotation marks omitted); *accord Hantz Fin. Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, ___ F. Supp. 3d ___, 2015 WL 5460632, at *2 (E.D. Mich. Sept. 17, 2015). "[S]ummary judgment in favor of the party with the burden of persuasion is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact." *Cockrel*, 270 F.3d at 1056 (quoting *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999)); *see also*

*Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). "Plaintiff['s] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for plaintiffs." *Hantz Fin. Servs*, 2015 WL 5460632, at *2 (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)) (internal quotation marks omitted). "If the defendant[] respond[s] to the motion with controverting evidence which demonstrates a genuine issue of material fact, [the plaintiff's] motion must be denied." *Kassouf v. U.S. Liab. Co.*, No. 1:14CV2656, 2015 WL 5542530, at *3 (N.D. Ohio Sept. 18, 2015).

*FACTS*

The material facts of this case, which are undisputed unless otherwise noted, are as follows. Plaintiff was employed by the County from 1997 through 2014, during which he worked for the Emergency Management Agency ("EMA") and Ambulance Services ("EMS"). At EMS, he worked as a paramedic, responding to 911 emergency calls such as motor vehicle accidents and fires, and performing emergency rescue work alongside other ambulance units. His EMA duties, which were essentially clerical, included reaching out to other departments and involving them in developing and updating protocols; touring schools, nursing homes and other facilities for storm readiness and preparedness plan evaluation; and teaching various classes. Nance did not have a set schedule for performing EMA work.

Pursuant to an agreement, because of his full-time job with EMS, the work he performed for EMA was overtime under the FLSA for which he was paid at an overtime rate. In a declaration provided to the Court, Nance averred that, when he began working for EMA in 2004, he was paid for 32.25 hours per month regardless of how many hours he actually worked. He

was instructed by his then supervisor, Jerrell Reasons,[1] to keep track of and record all hours worked above 32.25 per month as compensatory "comp" time.

A contract signed April 19, 2004, stated:

> I, Jay[2] Nance, agree to the hourly rate of $15.50 per hour for the performance of work related to grant administration and Assistant Emergency Management Director responsibilities for Crockett County. It is understood and agreed that since I am a full time employee of the Crockett County Ambulance Service, that all work in regard to grant administration and Assistant Emergency Management Director will be paid at time and a half the agreed rate, listed above, in order to comply with the Fair Labor Standards Act. It is also understood and agreed that the compensation for this position . . . is in addition to and separate from my compensation from the Crockett County Ambulance Service.

(D.E. 24-2 at 1.) He executed similar agreements on August 30, 2012, and September 1, 2014, reflecting hourly rates of $16.60 and $17.42 per hour, respectively. The persons identified by the parties as those responsible for FLSA compliance were the County mayor, Gary M. Reasons, who served in that position beginning September 1, 2010, and Michelle Spraggins, who worked in the mayor's office.

According to the Defendant, a memorandum from the then County mayor Larry Griffin was circulated to all County officials and directors on August 5, 2004, advising that "[c]omp time is no longer used and has been replaced with [overtime] pay." (D.E. 24-4 at 315.) The missive directed employees to "document and turn in all hours owed to you at the end of each fiscal year from this point forward." (*Id.*) In his declaration, Nance insisted that he never received the memorandum or was otherwise notified of a change in policy with respect to comp time.

In a budget committee hearing on May 19, 2008, the Plaintiff's monthly hours with EMA were increased from 32.25 to 64.5 hours per month. Nance related in his deposition that the

---

[1]Reasons is now deceased.

[2]Mr. Nance also goes by the name "Jay."

increase occurred because he went before the budget committee and advised its members that he was working more hours that he was being paid for.

Plaintiff appeared before the committee on July 16, 2012, at which the following notes were taken by Spraggins.[3]

> The budget hearing was called back into session by Chairman Gary Williams. The first item of business was a request by Assistant EMA Director [(Nance)] to address the committee. Mr. Nance is concerned that he will not be compensated appropriately for the amount of time is he [sic] being required to spend on EMA. Mr. Nance has been paid occasionally in the past from his fulltime employer Crockett EMS when he had to attend training for EMA. When this was brought to the attention of the Mayor and County audit it had to be addressed. An employee can not be paid from one department while working for another and due to Mr. Nance being full time as a paramedic all time spent with EMA is considered [overtime] and must be paid a salary that would be time and a half. He is salaried at EMA in the amount of $12,851 per year and must be figured at $16.60 per [hour] to assure it hits [overtime] rates. He must keep a timesheet even though he is salaried and he must show that he is not working EMS and EMA at the same time. Mr. Nance wanted to be sure that the committee understood how valuable he feels that his services are and that the county might loose [sic] some funding if he leaves. He stated that he had brought in not only funding for EMA, but also for the rescue squad and fire departments. He is currently missing shifts at the ambulance service to attend EMA meetings. He says that his salaried amount comes out to 64.5 hours when he really works about 80 to 130 hours. He has a meeting that someone in the county needs to attend to ensure that the county has someone to teach [National Incident Management System ("NIMS")][4] so that all departments can be certified. He has upcoming training for this and feels that he should be compensated extra for it. He says since he is on duty during this meeting, he is having to pay someone to work for him. Using vacation time is not an option for him in his opinion. He feels that he should not have to use his time. He states that he is valuable and saves lives and he could be sitting pretty if he took money for his services rather than for equipment. He stated that there is litigation that would dictate the salary by the state for EMA staff by 2014. Commissioner Park asked Mr. Nance "What do you want?" Mr. Nance stated that he has missed 4 shifts at the ambulance service so far and will be missing 6 shifts later on. He wants money put into the EMA budget to pay him for the hours he works and not just for the salary. Mr. Park

---

[3]This is the third and final version of the hearing minutes, discussed in more detail *infra* pp. 9-14.

[4]NIMS, under the umbrella of the Department of Homeland Security, provides standards to guide local governments in disaster response preparation efforts. https://www.fema.gov/national-incident-management-system.

wanted to know if he could make up the shifts at the ambulance service by swapping shifts or on other days. He said that he could but he did not want to work back to back shifts since it takes away from his time with his family. He wants to add $7,000 to EMA's budget to pay him for his training and extra time. There was a motion made by Park to allow Mr. Nance to attend the training for NIMS and pay him for 8 [hours] per day at $16.60 per [hour] for the 5 training days. There was a second by Mr. Webb. Mr. Williams suggested that we look at moving $7,000 from line 131 in the ambulance service for EMA to pay Mr. Nance since he will not be getting paid from them during this training. Mr. Schwerdt and Mr. Ward stated that while Mr. Nance would not be getting paid, someone else would have to be paid and it would result in the same money from the ambulance service and would take away money that he was going to have to pay someone else if not Mr. Nance. Motion was made by Lowery and seconded by Park to move the money as suggested by Mr. Williams. Motion carried.

(D.E. 24-6 at 10-11.)

Plaintiff asserted in his declaration that he documented his hours in excess of 64.5 hours per month on a personal calendar and accrued them as comp time. In his deposition, he testified that he averaged approximately 100 hours per month working for EMA, and that he made the budget committee aware of the situation. The following testimony was adduced at his deposition:

Q:    Why didn't you turn in the extra time?

A:    Because I was keeping a record with it on those calendars.

Q:    Well, why didn't you turn it in on the time sheets?

A:    Because I was only allowed to turn in the 32.25 hours for payment, and then when it changed to 64.5 hours that's all I was allowed to turn in.

Q:    And who is it that told you you were only allowed to turn in 32.25 hours?

A:    Jerrell Reasons.

Q:    And did Jerrell Reasons tell you you were only allowed to turn in 64.5 hours?

A:    No.

Q:    Who told you that?

A:      The budget committee.

Q:      What specifically did they tell you?

A:      They increased my hours from 32.25 to 64.5 hours.

Q:      Did they increase it because you said you needed more time to do your
        job?

A:      Yes.

Q:      And did they tell you that that's all they were going to allow was 64 and a
        half hours?

A:      No, they did not say that.

Q:      Did they tell you you should be able to do it in 64 and a half hours?

A:      No.

(D.E. 24-1 at 29-30.)  Nance could not stop working beyond 64.5 hours, he claimed, because

"there were requirements that had to be completed in order for the county to receive money."

(*Id.* at 33.)

        In an email to Mayor Reasons dated August 9, 2013, concerning a new state requirement

that daycare centers have an emergency operations plan, Nance advised that

> [m]ost months I can not get EMPG requirements completed in the 64.5 hours I am
> paid monthly and I complete the requirements on my own time to keep the county
> compliant and also I have to maintain Crockett County's Homeland Security
> Equipment on my own time.  I can not take on writing plans for daycares through
> out the county unless I am authorized more hours monthly as needed.

(D.E. 24-4 at 18.)  Reasons forwarded the email to Spraggins with a note stating, "Listen to this

mess!!!"  (*Id.*)  In his deposition, the mayor testified that he had no discussions with Nance about

the content of the email.  He did recall having a conversation with Spraggins, in which he asked

if there was "time that he has not been paid for and she said when he turns in extra time we pay

him for it."  (D.E. 24-3 at 60.)

In a letter to Mayor Reasons, apparently received on October 3, 2014, after he voluntarily left the County's employ in September, Nance advised that he had accumulated approximately 4,967 comp hours for which he had not been paid and requested recompense therefor. According to Nance's declaration, Spraggins asked him upon his resignation whether he had any "additional time" for which he needed to be paid. (D.E. 28-2 ¶ 15.) He contended that the phrase was a term of art used to refer to what his timesheets called "extra office hours." (*Id.*) Plaintiff stated that "[t]hese extra office hours are from the budget line item that approved funds to pay me when I had to miss my EMS shift to attend an EMA meeting or other required EMA function. I could *only* use this 'additional time' if I missed an EMS shift to complete work for EMA." (*Id.*) Nance claimed that, when he completed EMA work on his own time, he could not claim these "extra office hours" and that, when he submitted his final time to Spraggins, she was only requesting "extra office hours." (*Id.* ¶¶ 16-17.) Thus, he could not submit his accumulated comp hours. (*Id.* ¶ 17.)

In the complaint, Nance alleged that Defendant failed to pay unused comp time upon the separation of his employment pursuant to 29 U.S.C. § 207(o)(4). He further averred that the County failed to pay overtime wages in violation of the FLSA.

### THE PARTIES' MOTIONS

The Defendant submits in its motion for partial summary judgment that (1) Plaintiff's FLSA claims are subject to the two-year limitation period set forth in the Portal-to-Portal Act; (2) his comp time claims are subject to the 240-hour limit articulated in 29 U.S.C. § 207(o); and (3) all Nance's claims accruing prior to October 2, 2012, or, in the alternative, October 7, 2011, are time-barred. In his motion, Plaintiff contends that (1) there is no genuine issue of material

fact that he worked more overtime than that for which he was compensated[5] and (2) he is entitled to liquidated damages as a matter of law. He also seeks an adverse inference based on wrongful conduct on the part of the County.

*ANALYSIS*

Plaintiff's Request for Sanctions

Before considering the merits of the parties' substantive claims, the Court will address that portion of the Plaintiff's motion for partial summary judgment requesting imposition of sanctions, specifically an adverse inference at trial, based on the late production of evidence. During discovery, the County produced two different versions of the July 16, 2012, budget committee hearing minutes. The first version reflected that Nance was paid a salary while the second had the words "salary" or "salaried" deleted four times.[6] When asked about the deletions in her deposition, which occurred after Reasons and Nance were deposed and a week before the discovery deadline, Spraggins explained:

> Probably because I'm driven as a budget administrator also -- everything for me is "salary." That's what I hear all day. Our officials are salary, this is salary. I, more than likely, put "salaried" in because that's what I put in and then it was brought to my attention, I'm sure, that with anybody else's budget it's not salary. And that's correct. Anything is a budgeted line item, not a salaried line item. So that's what we were working with.

> And Mr. Nance and/or Mr. Williams or whoever said, you know, it was budget and not salary. I'm not sure of that. But my brain drives on money, money, hourly, salary. But with this, it is a budgeted amount. And I can't say that for sure Mr. Nance said it. That's the way I wrote it. Because he just -- I don't know.

> Because this meeting went on for like an hour with just this presentation, and there's no way -- because some of it was chitchat, them talking, you know, What do you do with that, and stuff like that. In those minutes I don't have to keep up with them like this (indicating to court reporter).

---

[5]Nance's motion does not seek summary judgment as to the comp time claim.

[6]Plaintiff's status as a salaried employee has not been addressed in either of the motions currently before the Court.

This is a hearing, there's no votes. They just talk. He was alerting them he wanted this done, and he was going to put that in his budget. That's all the hearings are for. And this is a budget hearing. So it's a budgeted amount. He's changing his budget to reflect this.

(D.E. 24-5 at 45-46.) The following testimony was also adduced:

Q:    You just don't know why it was changed?

A:    No.

Q:    You don't know who told you to change it or if anyone told you to change it?

A:    If anyone told me to change it or if I changed it myself. It was 2012. I have no idea. I'm getting minutes ready to go out. You know, I don't know. It was a budgeted amount, so that could have been because it was a budget hearing and I said, Oh, this is budget. He's changing his budget. So that's what he was asking for is to make a change to his budget, and that's what he was asking. You know, I want to add some money to my budget.

Q:    So you previously testified it was what he said. It wasn't necessarily what he said that you wrote down?

A:    And he may have said my amount of my pay comes from so and so. I wish I remember. I don't know. I do. I don't remember. I just don't remember.

Q:    And you don't know how we ended up with two different versions?

A:    I probably pulled one off the computer because I didn't have access to the other ones to get everything to everybody. I just went in there with him with me and pulled this out of the file. Because stuff had been pulled out of the file. I had to dig around and find it. Because by the time I got brought in it, stuff had been pulled and started being reviewed.

So I probably pulled it off my computer. I could have done this at my home computer. I was just pulling anything that had Mr. Nance's name in it. I'm definitely not trying to fraud [sic] anybody.

(*Id.* at 47-48.) At that time, it was her testimony that the second was the final version.

Later in the deposition, which was taken at the Crockett County Courthouse, Spraggins stated, "I'm confused.  When we went in there a minute ago, the budget minutes have all been just pulled and scattered everywhere. . . .  So I have no idea where anything is in there anymore."  (*Id.* at 50-51.)  Following a break, a third version of the minutes was produced by Spraggins' counsel, which contained the statement "[Nance] says that his salaried amount comes out to 64.5 hours when he really works about 80 to 130 hours."  (D.E. 24-6 at 10.)  This statement did not appear in the first two versions.  The following testimony was taken of Spraggins concerning the production:

Q:      Okay.  Are those the final version of minutes, including the minutes for the July 16, 2012 Crockett County budget committee hearing?

A:      Yes.  They're the signed copies, they're the ones that were passed.

Q:      And you know that because they have a signature on them --

A:      Yes.

Q:      -- that includes your signature?

A:      Yes, sir.

                              *       *       *

Q:      And I believe you previously testified that Exhibit 51 [(the second version)] was the final version of the July 16, 2012 Crockett County budget committee hearing minutes, but do you now believe that the document that is Exhibit 52 [(the third version)] is, actually, the final version?

A:      Yes, sir.  I didn't have -- I did not have access to these because they were not in the file.

Q:      And, obviously, I didn't, because I'm not here.

A:      And like I said, I'm sorry.  They were under the folder because they were the wrong ones and were probably kept for that reason because they probably had to be corrected.  And I probably was told to do that by either

the mayor, myself, or Mr. Williams.  So this has to be or we would not have signed those.

*       *       *

Q:      If prior versions . . . did not contain a reference that Mr. Nance had told the committee that he was working 80 to 130 hours and only getting paid for 64.5, but the final version did, that would have been because either Mayor Reasons or Chairman Williams remembered Mr. Nance saying that and reminded you of it, correct?

A:      Yes, sir.  And I may have written -- I do this sometimes for number amounts, and Gary knows that.  If I'm trying to get all the wording right, I'll write down X, X, X, and question, question, question, and they'll write down -- like if we're going to a $400,000 or $425,000 loan that's going to be paid at 2.5 percent -- and they're saying that like I just did.  Rather than get that wrong, somebody will jot that down or I'll get the paperwork that corresponds to it.  And if I'm not mistaken, I may have even asked Mr. Nance for this, because Mr. Nance had a huge stack of paper that he was reading from.  I may have asked him.

        This was 2012.  I don't remember who told me, but this would have been the right one.

(D.E. 24-5 at 52-54, 56-57.)

Q:      I just want to get this on the record.  So today is July 31st, 2015, correct?

A:      Yes, sir.

Q:      And you agree with me that the document that's Exhibit 52, today is the first time that's been provided?

A:      Yes, sir.  As far as to my knowledge.  Like I said, it was not in my file.

Q:      It was not in your file, correct?

A:      It was not in the file that -- okay.  When this all first started, I didn't get fully involved because they didn't need my services at that point.  It was let's talk and see where we stand.  It was all without.  And apparently I had pulled this and given it to the mayor at some point, and when I went back in there a while ago, this was all gone.  This was not in there.

Q:      Exhibit 52?

A:      Yes, sir.

Q:      So today is the first time you've seen it in an awfully long time?

A:      Yes, sir.

Q:      And it's certainly the first time I've seen it, right?

A:      Yes, sir.

Q:      Now, you testified that Mr. Nance never told you that he had accumulated a significant amount of comp time, correct?

A:      Yes, sir.

Q:      But on July 16, 2012, he did tell you and Mayor Reasons and everyone else on the budget committee that he was working 80 to 130 hours but only getting paid 64.5, correct?

A:      Yes, sir.

Q:      And that is in writing in Exhibit 52, correct?

A:      Yes, sir.

Q:      And it appeared for the first time today, correct?

A:      Yes, sir.

(*Id.* at 80-82.)

By way of response, the Defendant points out that the evidence was eventually produced and that all of the minutes, which are matters of public record, were available for inspection and copying had Plaintiff chosen to view them at the County offices. According to the Defendant, he did not.

The adverse inference Nance seeks is generally requested in connection with spoliation, which is defined as "the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Spalding*, 438 F. App'x 464, 467 (6th Cir. 2011) (quoting *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004)). "An adverse

inference for evidence spoliation is appropriate if the defendants knew the evidence was relevant to some issue at trial and their culpable conduct resulted in its loss or destruction." *Carlson v. Fewins*, 801 F.3d 668, 678 (6th Cir. 2015) (quoting *Adkins v. Wolever (Adkins II)*, 692 F.3d 499, 504 (6th Cir. 2012)) (internal alteration omitted), *reh'g denied* (Sept. 29, 2015). "Willful spoliation of relevant evidence is generally punished by an adverse-inference jury instruction." *Webb v. United States,* 789 F.3d 647, 669 (6th Cir. 2015). Such an instruction allows the jury to assume that the spoliated evidence supported the opposing party's theory of the case. *Carlson*, 801 F.3d at 678.

The cases cited by the Plaintiff in support of his request address imposition of an adverse inference in the context of spoliation of evidence.[7] Here, of course, the minutes were not destroyed but were produced, albeit tardily. As the jury will have that evidence before it, there will be no need for it to make any assumptions as to the document's contents. Accordingly, the Court does not find that an adverse inference instruction is warranted. That is not to say the Plaintiff has no recourse, however, as there is nothing to prevent him from inquiring of witnesses at trial as to why there were three different versions of the minutes. The request for an adverse inference is DENIED.

---

[7]*See Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634 (6th Cir. 2009) (offending party refused to turn over relevant documents and information); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D. Cal. 1987) (defendant's counsel conceded that relevant documents had been destroyed and were permanently lost); *Cecil Corley Motor Co., Inc. v. Gen. Motors Corp.*, 380 F. Supp. 819 (M.D. Tenn. 1974) (court noted that "plaintiff destroyed records which might have been used either to establish or disprove damages or liability").

<u>FLSA Claims</u>

*The Statute Generally.*

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013). Specifically, the statute provides that

> no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Any employer failing to do so "shall be liable to the employee . . . affected in the amount of . . . [his] unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "Work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. If the employer "knows or has reason to believe that [the employee] is continuing to work[, . . .] the time is working time." *Id.* "The legislative debates indicate that the prime purpose of the legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 707 n.18 (1945)), *reh'g en banc denied* (July 8, 2015). The FLSA "puts directly into the hands of the employees who are affected by violation the means and ability to assert and enforce their own rights." *Id.* at 205 (quoting *O'Neil*, 324 U.S. at 706 n.16). In order to prevail on an FLSA overtime claim, the plaintiff "must prove, by a preponderance of the evidence, that he performed work for which he was not properly compensated." *Id.* (internal quotation marks omitted). The "remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee." *Id.* (quoting

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)); *see also Keller v. Miri Microsys. LLC*, 781 F.3d 799, 806 (6th Cir. 2015) ("Courts interpreting the FLSA must consider Congress's remedial purpose.").

*Defendant's Motion.*

Statute of Limitations.

The limitations period for FLSA actions is contained in the Portal-to-Portal Act. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 131 (1988). Thereunder, actions must be brought within two years after the cause of action accrued or, if the FLSA violation was willful, within three years thereof. 29 U.S.C. § 255(a); *Boaz v. FedEx Customer Info. Servs.*, 725 F.3d 603, 605 (6th Cir. 2013). The period is designed to "place a limit on employers' exposure to unanticipated contingent liabilities." *McLaughlin*, 486 U.S. at 132.

An FLSA violation is willful "if the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 842 (6th Cir. 2002) (quoting *McLaughlin,* 486 U.S. at 133) (internal quotation marks omitted). The implementing regulations instruct that "[a]ll of the facts and circumstances surrounding the violation shall be taken into account in determining whether a violation was willful." 29 C.F.R. § 578.3(c)(1). An employer's conduct is "knowing" if, among other situations, it "received advice from a responsible official of the Wage and Hour Division to the effect that the conduct in question is not lawful." 29 C.F.R. § 578.3(c)(2); *Walls v. Host Int'l, Inc.*, Case No. 1:15-CV-00564, 2015 WL 5895211, at *3 (N.D. Ohio Oct. 7, 2015). "Reckless disregard" includes circumstances in which "the employer should have inquired further into whether its conduct was in compliance with [the FLSA], and failed to make adequate further inquiry." 29 C.F.R. § 578.3(c)(3); *Walls*, 2015 WL 5895211, at *3. Mere negligence or

unreasonableness on the employer's part is insufficient to support a finding of willfulness. *Elwell*, 276 F.3d at 841 n.5 (citing *McLaughlin*, 486 U.S. at 135); *Hall v. Cocke Cty., Tenn.*, No. 90-6060, 1991 WL 151019, at *3 (6th Cir. Aug. 8, 1991) (citing *McLaughlin*, 486 U.S. at 145). "The employer's conduct must rise to the level of recklessness." *Lopez-Gomez v. Jim's Place, LLC*, No. 2:14-cv-02309-JPM, 2015 WL 4209809, at *7 (W.D. Tenn. July 10, 2015) (citing *Hall*, 1991 WL 151019). The burden of showing willfulness lies with the employee. *Stultz v. J.B. Hunt Transp.*, 35 F. Supp. 3d 866, 878 (E.D. Mich. 2014).

The Defendant asserts that its conduct was not willful because Nance prepared his own EMA timesheets and forwarded them to the payroll department for payment. The County also contends that, since he failed to notify it of his overtime work, there was no violation of the FLSA.

In response, Plaintiff points to his deposition testimony, as well as that of Mayor Reasons and Spraggins. In his deposition, Nance averred, "Every time I went before the budget committee I explained to them that I was putting in over 100 hours a month." (D.E. 24-1 at 30.) Mayor Reasons related at pages twenty-one and twenty-two of his deposition thusly:

> Q:    . . . [W]hen you heard on July 16, 2012, that Mr. Nance telling the budget committee that his salaried amount comes out to 64.5 hours when he really works more on occasion, did you do anything to go back and pay him for the other hours he worked?
>
> A:    He turns in time sheets for extra time, and when he does he is paid and compensated for that, yes, sir.
>
> Q:    So on -- when you heard -- when you heard on July 16, 2012, Mr. Nance announced in the budget committee meeting that his salaried amount comes out to 64.5 hours when he really works more on occasion, did you do anything to investigate that allegation?
>
> A:    No, sir.

Q:  Okay. In other words, you didn't do anything to look into it to see whether he was telling the truth or not, did you?

A:  I knew he was probably telling the truth because he gets compensated the extra time.

Q:  All right. You did not take this to mean that he was working hours that he wasn't being paid?

A:  No.

Q:  Okay. Do you know whether anybody did anything to investigate whether he was getting paid for working hours he wasn't getting paid for?

A:  No, I'm not aware.

(D.E. 24-3 at 22-23.)

Reasons offered the following testimony concerning the August 9, 2012, email:

Q:  And you-all did not ask Mr. Nance about the uncompensated time that he was claiming, correct?

A:  When Mr. Nance would send us his time sheets, if there was extra time he would be paid for it on numerous occasions.

Q:  When you got the August 9, 2012, e-mail you did not ask Mr. Nance about the extra time that he was performing on his own time, did you?

A:  No. I had no discussions with him, other than the e-mail.

Q:  And you didn't tell Ms. Spraggins or anyone else to follow up with him and ask him what he was talking about, correct?

A:  I asked Ms. Spraggins, we had a discussion, was there time that he has not been paid for and she said when he turns in extra time we pay him for it.

Q:  Do you know whether she talked to him about it?

A:  No, sir. I'm not aware of whether she did or not. Sometimes Mr. Nance would come in the office, and he would talk to Michelle Spraggins, and I might not be aware of what the conversations were.

Q:  But at any rate you didn't --

A:  Sometimes it's general conversation.

Q:      -- but at any rate you didn't ask Mr. Nance about it?

A:      No.

Q:      And you didn't follow up with Ms. Spraggins to see if she had done anything to investigate it, correct?

A:      I followed up with Ms. Spraggins to see if he was paid for all the time that he turned in.  He was compensated for hours worked.

Q:      You didn't follow up with Ms. Spraggins about the August 9, 2012, e-mail where he had said that he was performing work on his own time?  You never went to her and said, hey, did you ever talk to Jay about whether or not -- what he was talking about in this e-mail?  You never had a conversation like that, did you?

A:      I'm not for sure.  If I did I can't recall.

(*Id.* at 59-61.)  Spraggins recalled in her deposition that

I think [Nance] sent a memo to the mayor about something to do with day cares needing something, and at that point he said that if he did it, it would require X amount of hours.  The mayor said -- well, I said, we've got extra time.  We put $7,000 in the budget for any extra time that he had to spend doing EMA business that took him away.  And he said, Okay.

(D.E. 24-5 at 33-34.)

The determination of whether an employer's conduct is willful is a factual one.  *Ricco v. Potter*, 377 F.3d 599, 602 (6th Cir. 2004).  Here, it is undisputed that Nance complained to County officials that he was performing overtime work for which he was not being paid.  A reasonable factfinder could infer that these complaints, which, viewed in the light most favorable to Nance, were not acted upon by his employer, at least constituted reckless disregard.  Thus, there exists a genuine issue of material fact precluding summary judgment for the Defendant on the issue of willfulness.  The County's motion for summary judgment as to application of the two-year statute of limitations is DENIED.  *See Bacon v. Eaton Aeroquip, LLC*, No. 11-cv-14103, 2014 WL 5090825, at *9-10 (E.D. Mich. Oct. 9, 2014) (summary judgment for defendant

on willfulness not appropriate where plaintiff brought forth evidence of complaints made to employer about lack of compensation for overtime work); *Michon v. Western Exp., Inc.*, No. 3:13-cv-00189, 2014 WL 3924590, at *6-7 (M.D. Tenn. Aug. 11, 2014) (where question of fact existed, motion for summary judgment for the defendant on finding as to willfulness as a matter of law denied). At the trial of this matter, the jury will have to determine whether the County's conduct was willful. If the factfinder concludes that it was not, the two-year statute of limitations will be applied. If so, the jury will utilize the three-year period for a willful violation. *See Bacon*, 2014 WL 5090825, at *10.

Comp Time Limit.

As noted above, the Plaintiff seeks payment for unused comp time. Comp time is "paid time off the job which is earned and accrued by an employee in lieu of immediate cash payment for employment in excess of the statutory hours for which overtime compensation is required" under the FLSA. 29 C.F.R. § 553.22(a). The statute, which permits political subdivisions to compensate employees for overtime by granting comp time, *see Christensen v. Harris Cty.*, 529 U.S. 576, 579-80 (2000), states in pertinent part as follows:

> (o)   (1)   Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.
>
> (2)   A public agency may provide compensatory time under paragraph (1) only --
>
> (A)   pursuant to --
>
> (i) applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees; or

> (ii) in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before the performance of the work; and
>
> (B) if the employee has not accrued compensatory time in excess of the limit applicable to the employee prescribed by paragraph (3).
>
> *       *       *
>
> (3) (A) If the work of an employee for which compensatory time may be provided included work in a public safety activity, an emergency response activity, or a seasonal activity, the employee engaged in such work may accrue not more than 480 hours of compensatory time for hours worked after April 15, 1986. If such work was any other work, the employee engaged in such work may accrue not more than 240 hours of compensatory time for hours worked after April 15, 1986. Any such employee who, after April 15, 1986, has accrued 480 or 240 hours, as the case may be, of compensatory time off shall, for additional overtime hours of work, be paid overtime compensation.
>
> (B) If compensation is paid to an employee for accrued compensatory time off, such compensation shall be paid at the regular rate earned by the employee at the time the employee receives such payment.

29 U.S.C. § 207(o)(1)-(3).

It is the position of the County that, as it is undisputed his EMA time was not "emergency response activity," Nance should be subject to the FLSA's 240-hour limit on comp time.[8] "[A]s a general matter, the [Department of Labor]'s interpretive regulations under the FLSA constitute a body of experience and informed judgment to which courts may properly resort for guidance."

---

[8]With respect to the requirement that comp time be provided pursuant to a collective bargaining agreement or "an agreement or understanding arrived at between the employer and employee before the performance of the work," 29 U.S.C. § 207(o)(2), Nance relies on Jerrell Reasons' instruction that he keep track of and record his hours worked in excess of 32.25 hours per month as comp time. In its briefs, Defendant does not appear to dispute that, at least until 2004, it permitted the use of comp time for some employees.

*McGrath v. City of Philadelphia*, 864 F. Supp. 466, 474 (E.D. Penn. 1994) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)) (internal alterations & quotation marks omitted). The regulations promulgated in connection with § 207(o) define "emergency response activities" as

> includ[ing] dispatching of emergency vehicles and personnel, rescue work and ambulance services. As is the case with "public safety" and "seasonal" activities, an employee must regularly engage in "emergency response" activities to be covered under the 480-hour limit. A city office worker who may be called upon to perform rescue work in the event of a flood or snowstorm would not be covered under the higher limit, since such emergency response activities are not a regular part of the employee's job. Certain employees who work in "emergency response" activities for the purposes of section 7(o)(3)(A) may qualify for the partial overtime exemption in section 7(k) of the Act.

29 C.F.R. § 553.24(d).

In response, Plaintiff argues that his *combined* work for both County agencies entitles him to the higher limit pursuant to subsection (a) of the regulation, which states as follows:

> Employees whose work includes "seasonal," "emergency response," or "public safety" activities, *as well as other work*, will not be subject to both limits of accrual for compensatory time. *If the employee's work regularly involves the activities included in the 480-hour limit, the employee will be covered by that limit.* A public agency cannot utilize the higher cap by simple classification or designation of an employee. The work performed is controlling. Assignment of occasional duties within the scope of the higher cap will not entitle the employer to use the higher cap. Employees whose work does not regularly involve "seasonal," "emergency response," or "public safety" activities are subject to a 240-hour compensatory time accrual limit for FLSA overtime hours which are worked after April 15, 1986.

29 C.F.R. § 553.24(a) (emphasis added).

The plain language of subsection (a) indicates that it applies to the situation presented in this case, that is, where a municipal employee works in multiple capacities for the same employer. It is undisputed that Nance performed emergency response activities in the form of paramedic duties in his work for EMS. Accordingly, since his work for the County in multiple capacities regularly involved emergency response activities included in the 480-hour limit,

Plaintiff is covered by the higher cap despite the fact that he performed some work, including his EMA duties, that fell under the lower 240-hour limit.[9] Defendant's motion for summary judgment on this issue is, therefore, DENIED.

Certain Claims as Time-Barred.

Finally, the County submits that any claims for nonpayment prior to October 7, 2012, in the case of a nonwillful violation of the FLSA, or October 7, 2013, for a willful violation, are time-barred. The Plaintiff disagrees with this premise as to his comp time claims, explaining that, by accumulating 263 hours of comp time in 2004 and 651.75 hours in 2005, he met the 480-hour comp time cap early in his employment by the County. He retained this comp time bank until his employment ended. Consequently, he submits, none of the 480 hours of comp time for which he seeks compensation overlap with the separate unpaid overtime accumulated after October 7, 2011, three years prior to the filing of his complaint.

In support of his theory, Nance cites to *Archer v. Sullivan County, Tennessee*, Nos. 95-5214, 95-5215, 1997 WL 720406 (6th Cir. Nov. 14, 1997). In that case, the Sixth Circuit Court of Appeals observed that, "[a] cause of action is deemed to accrue, as a general rule, at each regular payday immediately following the work period during which the services were rendered

_____

[9]The County also argues that "[b]ecause comp time is accrued based upon what are commonly known as straight time hours and since Nance's time at EMA was always overtime, the effect is that any time beyond 180 hours [rather than 240] was such that it required the cash payment of overtime." (D.E. 25-1 at 10.) Neither the statute nor the regulations cited appear to address this aspect of Nance's employment with EMA and the Defendant has referred the Court to no case law supportive of its position. Plaintiff contends that, since he was being paid at an overtime rate at EMA, his comp time accrued at a rate of one hour of comp time for one hour actually worked, rather than the one and one-half hours of comp time per hour worked mandated by § 207(o). He further submits that the County's assertion that his claim should be limited to 180 hours (or a similar reduction under the 480-hour limit) would reduce his accrual of comp time to a rate of one hour of such time to every one and one-half hours worked. The Court agrees that this result appears to be contrary to the broad purposes of the FLSA. Without more persuasive argument on the part of the Defendant, the Court is disinclined to grant the relief sought by the County on this issue.

for which the wage or overtime compensation is claimed." *Archer*, 1997 WL 720406, at *2 (quoting *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 271 (5th Cir. 1987)) (internal quotation marks omitted). However, where the parties had an agreement or understanding that employees could accrue comp time that could be banked indefinitely in lieu of overtime pay, the appellate court concluded that the injury occurred when the municipality advised employees that comp time would no longer be granted for accumulated overtime. *Id.* at *2-3. In *Archer*, the plaintiffs' claims accrued in 1991 when the repudiation took place, even though the work for which they sought comp time was performed from 1985 through 1988. *Id.* Based on the Sixth Circuit's decision, Nance maintains that the statute of limitations did not begin to run on his comp time claims until 2014 when the County refused to pay him for those hours, which he began to accrue in 2004. In light of evidence that employees were notified in August 2004 that comp time would no longer be permitted, there exist fact questions which preclude a definitive determination as to when the comp time claims accrued and, consequently, whether they are time-barred. Accordingly, the motion for summary judgment on statute of limitations grounds is DENIED.

*Plaintiff's Motion.*

Nance seeks summary judgment as to liability on his claim for overtime compensation. In response, the County points to various evidence in the record, including Nance's deposition, in which he appeared to acknowledge that, in 2012 and 2013, he on some occasions submitted EMA timesheets to the County, and was paid, for dates and times he was also being paid for EMS work. In connection with at least some of those instances, he admitted that the personal calendar he kept to record his EMA hours was inaccurate. His testimony also revealed that at times he was paid for hours he did not in fact work or noted hours on his calendar for which he

never submitted a timesheet. Nance further conceded that no one told him he was not permitted to report over 64.5 hours.

In addition, the Defendant cited to the declaration of EMA Director Larry Joe Jones, who related that he generally signed off on Nance's timesheets, which Plaintiff prepared himself and represented were accurate. Jones' position was essentially part-time and required his presence in the office Monday through Friday from 8:00 a.m. to noon. The crux of the declaration was that Nance spent time helping his wife at her convenience store; exercising daily for an hour, either alone or with friends, in a gym he set up at the EMA offices and picking up his children from school when he should have been doing EMA work. Nance does not dispute that he set up the gym and worked out there during the day.

Jones noted that, in addition to clerical duties, Nance maintained generators and emergency trailers owned by the County. The generators had to be started and operated once weekly in order to keep the batteries charged. While the generators were running, Nance often returned to the office to do paperwork. The emergency trailer maintenance essentially involved making sure the various supplies stored therein were inventoried and replaced when they expired. Jones recalled that, after Plaintiff resigned, it was discovered that most of the supplies had expired in 2012 and 2013.

Jones advised that the paperwork and other duties performed by Plaintiff for EMA were, subsequent to his resignation, completed by another employee who also carried out additional work that was not part of Nance's job description. The new employee's duties, both those previously performed by Plaintiff and not, were completed in twenty or less hours per week. In Jones' view, Nance's position could not have consumed more than 64.5 hours per month absent a natural disaster and, given what little work he had to do, if Plaintiff had told him he was working

more than 64.5 hours per month, he "would have seriously questioned it." (D.E. 27-1 ¶¶ 15, 18.) The agency director added there was no reason not to turn in hours in excess of the County-budgeted 64.5 hours because at least some of it could have been passed through, and presumably paid by, the Department of Homeland Security. In his deposition, a copy of which was submitted to the Court by the Plaintiff, Jones testified that, as far as he was aware, Nance was not working eighty to 130 hours at EMA as he claimed at the budget committee hearing. Jones recalled speaking to the mayor about the matter after the hearing and telling him that he did not know whether the claim was true.

Based on the current record, and construing all facts in favor of the County, the nonmovant, it is the Court's opinion that genuine issues of material fact exist as to whether Nance worked the overtime hours he claimed, precluding summary judgment for the Plaintiff on the question of liability for overtime compensation. In light of the Court's conclusion, Nance's motion for summary judgment on liquidated damages is denied as premature, as such damages become an issue only upon a finding of liability under the FLSA in the first instance. *See Lemieux v. City of Holyoke*, 740 F. Supp. 2d 246, 258 (D. Mass. 2010) (plaintiff's motion for summary judgment on the issue of liquidated damages denied as premature, as the defendants' violation of the FLSA was yet to be determined).

*CONCLUSION*

For the reasons articulated herein, the parties' motions for partial summary judgment are DENIED. The matter will proceed to trial.

IT IS SO ORDERED this 15th day of December 2015.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE